Albert JOHNSON, Plaintiff-Appellant,

v.

AMERICAN MUTUAL LIABILITY INSURANCE COMPANY et al., Defendants-Appellees.

No. 75–4451.

United States Court of Appeals, Fifth Circuit.

Sept. 19, 1977.

James C. Wood, Jonathan P. Gardberg, Mobile, Ala., for plaintiff-appellant.

W. Boyd Reeves, Norman E. Waldrop, Jr., Sidney H. Schell, Mobile, Ala., for defendants-appellees.

Before WISDOM and GEE, Circuit Judges, and BOOTLE *, District Judge.

BOOTLE, District Judge.

The plaintiff, Albert Johnson, despite the fact that he is receiving all compensation payments and medical benefits to which he is currently entitled under the Longshoremen's and Harbor Workers' Compensation Act, as amended, 33 U.S.C.A. § 901, et seq., filed suit against his employer's compensation insurance carrier to recover damages because of alleged negligence and wantonness in conducting certain safety inspections and in providing safety engineering to plaintiff's employer. After extensive factual development by pleadings, depositions, exhibits and affidavits in the court below, the court granted summary judgment in favor of the insurance carrier. The controlling question is whether such insurance carrier in making or in failing to make safety inspections and in making or in failing to make safety recommendations with respect to the operation of the business covered by the compensation insurance contract, is entitled to partake of the employer's insulation from liability for acts of negligence or wantonness. Upon the basis of our affirmative answer to that question we AFFIRM.

### I. The History of This Case

The history of this case is a bit complex. The plaintiff, Albert Johnson, filed this lawsuit in a state court against the defendants American Mutual Liability Insurance Company and American Mutual Liability Insurance Company of Boston (collectively "American Mutual") and several named supervisory personnel of plaintiff's employer, Bender Welding and Machine Company, Inc. ("Bender"). The state court sustained a motion to dismiss the individual defendants. The plaintiff filed an amended complaint naming only American Mutual as defendants. The case was then removed to

* Senior District Judge of the Middle District of Georgia, sitting by designation.

the court below. American Mutual's motion to dismiss the complaint was denied and the court below certified the case for an immediate appeal from this interlocutory order of dismissal. Leave to appeal from the interlocutory order was denied by this court on May 15, 1975, which ordered as follows:

> IT IS ORDERED that leave to appeal from the interlocutory order of the United States District Court for the Southern District of Alabama entered on February 18, 1975, is DENIED. See *Keller vs. Dravo Corporation,* 441 F.2d 1239 (CA5, 1971), *cert. denied,* 404 U.S. 1017, [92 S.Ct. 679,] 30 L.Ed.2d 665 (1972). The defendant-petitioners may again seek certification when a record as described in *Keller* is developed. See 441 F.2d at 1242. Our disposition of this application for leave to appeal is not intended to indicate whether ultimately we would grant leave to appeal on a record thus developed.[1]

Thereupon American Mutual filed a motion for summary judgment.[2] On November 3, 1975, the court below entered an order which, after referring to this court's above-quoted order of May 15, 1975, continued "having considered all of the pleadings on file, the depositions of Thomas E. Ellison, Seneca W. Foote, Albert Johnson and G. F. Montiel, affidavits on file, and argument of counsel, the court is of the opinion that there is sufficient factual development to satisfy the requirements in *Keller*." American Mutual's motion for summary judgment was granted and notwithstanding the presence of an additional defendant in the case, the court expressly determined in accordance with Fed.R.Civ.P. 54(b) that there was no reason for delay in entering final judgment which was entered in favor of American Mutual.

## II. Summary of the Facts

As above indicated, plaintiff's employer was Bender, and Bender's compensation insurance carrier was American Mutual. Plaintiff worked as a sandblaster from November 1959 to early 1968 when he was hospitalized because of a lung condition. He returned to work in July 1968 and worked until the latter part of 1972 when he quit work and entered the hospital. Upon returning to work in July 1968, the plaintiff advised Bender of his lung condition and was given the job of crew pusher. When working as a sandblaster, the plaintiff was furnished a hood and a respirator by Bender. He testified that holes as big as quarters would develop in the hoods and that when he requested replacements with hoods without holes, Bender would not supply them. As a crew pusher the plaintiff wore a respirator but not a hood. As a crew pusher he sandblasted only three, four or five times.

While plaintiff contends that American Mutual was an integral and controlling part of the safety program at Bender and that it assumed the duty of supplying Bender with safety engineering, American Mutual in support of its motion for summary judgment, has successfully demonstrated that this is not so and that there is no genuine issue of fact on this score. Clearly, what American Mutual did, and all that it did, was in pursuance of and in accordance with, its contractually acquired privilege (not obligation) to "inspect . . . the work places, operations, machinery and equipment covered by this policy" and "to examine and audit the insured's . . . records."[3] American Mutual maintained an engineering department. In that depart-

---

1. The petition for appeal appears as this court's case No. 75–8062, *American Mutual Liability Insurance Co. et al. v. Albert Johnson.*

2. Thereafter plaintiff filed a new amended complaint adding Mobile Paint Manufacturing Co. as a party defendant.

3. The applicable insurance contracts provide: "Inspection and Audit. The company and any rating authority having jurisdiction by law shall each be permitted but not obligated to inspect at any reasonable time the workplaces, operations, machinery and equipment covered by this policy. Neither the right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking on behalf of or for the benefit of the insured or others, to determine or warrant that such workplaces, operations, machinery or equipment are safe.

ment were S. W. Foote and G. E. Richter, who were experts or otherwise experienced in the safety and health problems inherent in the practice of sandblasting. The work done by the engineering department is two-fold, first to obtain information for underwriting purposes, and second to audit the policy holder's safety program. During the period from 1969 through 1972, persons acting in Mutual's behalf visited the site of Bender's operations at least forty-one times. Mutual has no records of the purpose of those visits except the reports of two visits, one on April 28, 1965, the other on February 26, 1969, all such records except the two mentioned having been destroyed prior to the filing of this lawsuit. These two reports were sent to Bender addressed to its president, Mr. T. B. Bender.

The record of the visit of April 28, 1965 shows that on that date Mr. Foote visited the plant at a time when no sandblasting was in progress and therefore no air samples for dust exposure could be secured. The equipment used in sandblasting was examined and it was noted that the helmets used were approved by the United States Bureau of Mines. The report shows that Mr. T. E. Ellison, Vice President, accompanied Mr. Foote during the visit and advised him that sandblasters did not wear the supplied-air abrasive blasting helmets when they were blasting outside of ships.[4] This report contains two recommendations:

1. Supplied air abrasive blasting helmets should be used by employees engaged in sandblasting whether inside or outside of ships.

2. Supplied air abrasive blasting helmets should be used in accordance with American Standards Association Code S 2.1–1959 titled "Head, Eye, and Respiratory Protection."

The report in its introductory paragraph discloses the purpose of the visit as well as the purpose of the report as follows:

The purpose of this study was to evaluate the dust hazard during sandblasting at this plant.

This report is intended to aid you [Bender's president] and others in your organization responsible for your Safety Program to reduce the incidence of occupational disease. It is intended to bring to your attention examples of hazards and conditions deemed by the Industrial Hygienist to most need your prompt consideration and attention. It is not intended to imply that other hazards and conditions are under control at the time of this visit or of other visits.

A report dated March 6, 1969 shows that Mr. Foote, accompanied by Mr. Richter, visited Bender's plant on February 26, 1969 "to evaluate the dust hazard during sandblasting." As in the earlier reported visit, no sandblasting was in progress. The visitors "were informed (by unnamed persons) that air-supplied abrasive blasting helmets were used when blasting in confined spaces, but air-supplied helmets were not used when sandblasting in the open." Again, Mutual, through these visitors, recommended as follows:

Supplied-air abrasive blasting helmets should be used by employees engaged in sandblasting whether in confined spaces or in the open.

This report concluded with this caveat:

Neither the visit of our representative under the terms of our policy nor the making of this report constitutes an undertaking to determine or warrant that your premises or operations are safe.

At all relevant times Bender maintained its own safety program with a Safety Di-

---

"The company and any rating authority having jurisdiction by law shall each be permitted to examine and audit the insured's payroll records, general ledger, disbursements, vouchers, contracts, tax reports and all other books, documents and records of any and every kind at any reasonable time during the policy period and any extension thereof and within three years after termination of this policy, as far as they show or tend to show or verify the

amount of remuneration or other premium basis, or relate to the subject matter of this insurance."

4. Mr. Ellison does not recall this conversation and testified that "The man didn't talk to me about it." He testified further that air-supplied hoods were supposed to be used "both inside and outside."

rector in charge. It welcomed and invited advice and recommendations from American Mutual and in this regard and to this extent received 100% cooperation from American Mutual in their common desire to prevent accidents and to keep the premiums down. This advice and cooperation included American Mutual's sending safety representatives, at Bender's invitation, to attend safety meetings and making safety talks along with Bender's representatives at such meetings. At no time did Bender delegate to American Mutual, and at no time did American Mutual accept or assume, responsibility for safety in Bender's operations. American Mutual's participation in Bender's safety program was in an advisory capacity.

### III. Pretermission

■ The district court did not specify the grounds upon which it granted summary judgment in favor of American Mutual. It was based either upon the insurance carrier's immunity from suit in negligence based actions or upon American Mutual's having demonstrated plaintiff's inability to prove a case based upon the theory of negligent or wanton[5] inspection. The district court's order after referring to the above mentioned suggestion of this court that "a record as described in Keller (Keller v. Dravo Corp., 441 F.2d 1239 (5th Cir. 1971)) [be] developed," continued "[h]aving considered all of the pleadings on file, the depositions of Thomas E. Ellison, Seneca W. Foote, Albert Johnson, and G. F. Montiel, "affidavits on file, and argument of counsel, the court is of the opinion that there is sufficient factual development to satisfy the requirements in Keller." Convinced as we are that the insurance carrier, under the facts of this case, is entitled to partake of the employer's immunity from suit in negligence based actions, we do not reach and we pretermit the question whether the factual development in the court below sufficiently demonstrated plaintiff's inability to prove a case based upon the theory of negligent inspection. That factual development sufficiently dem-

onstrates that under the facts of this case the carrier is entitled to immunity.

Our very question was presented in Keller v. Dravo Corp., 441 F.2d 1239 (5th Cir. 1971). There this court, pretermitting any resolution of the issue, vacated the grant of summary judgment in favor of the carrier because it had been granted solely on the pleadings without affidavit or other factual fleshing. The case was remanded for the joining of issue and for a sufficient factual development. Similarly, as heretofore stated, this court denied leave to appeal in the case sub judice from an interlocutory order refusing to dismiss the complaint, at the same time expressing this court's willingness to consider a new application to appeal "when a record as described in Keller is developed." We agree with the court below that there has now been a sufficient factual development. It has been developed inter alia that all that the carrier did or failed to do was pursuant to its privilege of inspection expressed in the insurance contract; that all of its nonfeasance or misfeasance complained of related directly to the operation of the business covered by its insurance contract; that in all this, it was "performing an integral part of its function under the Act" (Kotarski v. Aetna Cas. & Sur. Co., 244 F.Supp. 547, 560 (E.D.Mich.1965)); that the employer carried on a safety program as an integral part of its regular business routine and that the carrier's inspection activities were merely an adjunct thereto (Williams v. United States Fidelity & Guaranty Co., 358 F.2d 799, 802 (4th Cir. 1966)); that it undertook to do no more than was expected of the employer (Williams v. United States Fidelity & Guaranty Co., supra at 801); that at most, it was undertaking to perform a duty imposed upon the employer by statute and by common law (Donohue v. Maryland Cas. Co., 248 F.Supp. 588, 591 (D.Md.1965)); that it was so essentially identified with and engaged in the employer's insured business that it cannot appropriately be looked upon as being "some person other than the employer" or as "such third person" (33 U.S.C.A. § 933(a)); that

---

**5.** The characterization of negligence as wanton or gross does not affect the exclusiveness of the remedies provided by compensation acts.

See 101 C.J.S. Workmen's Compensation § 927, and Pfeifer v. GMC Truck & Coach Div., 255 F.2d 40 (6th Cir. 1958).

its alleged negligence is not "wholly divorced from any obligation it may have had as a workmen's compensation carrier" (*Bartolotta v. Liberty Mutual Ins. Co.,* 411 F.2d 115, 117, note 5 (2d Cir. 1969)); that it was not "a stranger to the business," but indeed was "engaged in the business" of the insured (*Williams v. United Fidelity & Guaranty Co., supra* at 801, and *Doane v. E. I. Dupont de Nemours & Co.,* 209 F.2d 921 (4th Cir. 1954), both construing the Virginia statute); and that it "did not undertake to perform a voluntary act for the benefit of someone else [but acted] for its own protection in order to reduce risks that might give rise to liability on the policy" (*Gerace v. Liberty Mutual Ins. Co.,* 264 F.Supp. 95, 97 (D.D.C. 1966)).

## IV. Carrier Partakes of Employer's Immunity

■ After the advent of workmen's compensation laws, approximately a half century passed before the appearance of the first reported case permitting an employee to maintain a suit for damages against his employer's insurance carrier based upon the theory of negligent inspection.[6] This proves nothing except the novelty of the idea of holding the carrier liable for damages as distinguished from compensation. In some jurisdictions this idea was accepted. In others it was rejected. We shall not "count jurisdictions" but it seems to be generally assumed that those courts not permitting such actions and ascribing to the carrier the employer's immunity, represent the majority view.[7] Federal courts, *Erie*-bound, have, of course, applied state law in diversity cases, sometimes allowing,[8] sometimes denying[9] immunity. In some instances, emphasis is placed upon particular statutory verbiage; in all instances the object of the court's search is the intent to be ascribed to the legislative body in light of the language used and the policy considerations involved. We thus approach consider-

**6.** That case is *Smith v. American Employer's Ins. Co.,* 102 N.H. 530, 163 A.2d 564 (1960). "The theme of the dissent in this three-to-two decision is, in effect, that throughout the history of the Act it was always assumed that the insurer stood in the shoes of the employer. This is largely true." Larson, *Workmen's Compensation Insurer as Suable Third Party,* 1969 Duke L.J., 1117, 1121.

As to the origin of compensation laws, one of American Mutual's advertisements says, "The Workmen's Compensation Act was passed in 1912." Corpus Juris Secundum reports that the first national compensation act was that of Germany in 1884, that this type legislation appeared in the United States in the form of federal legislation applicable to certain classes of government employees as early as 1908 and that by 1921, such legislation had been adopted by all the American states which had any considerable industrial development. 99 C.J.S. Workmen's Compensation § 5, p. 48, notes 34, 36.

**7.** *Bartolotta v. United States,* 276 F.Supp. 66, 72 (D.Conn.1967); *Bartolotta v. Liberty Mutual Ins. Co.,* 411 F.2d 115, 118 (2d Cir. 1969); *Keller v. Dravo Corp.,* 441 F.2d 1239, 1243 (5th Cir. 1971). *But see Smith v. Liberty Mutual Ins. Co.,* 409 F.Supp. 1211, 1218 (D.N.C.1976). *Keller* provides in footnote 3 a listing of cases representing the majority view and in footnote 4 those representing the minority view as of 1971. These listings are supplemented in the 1976 case of *Smith v. Liberty Mutual Ins. Co., supra,* footnotes 5 and 6. The Alabama case of *Beasley v. MacDonald Engr. Co.,* 287 Ala. 189,

249 So.2d 844, 851 (1971), a five-to-three decision, so much relied upon by plaintiff, concedes that "perhaps the numerical majority of courts considering this question have found a legislative intent to equate the employer and insurer for purposes of immunity from common law liability." While *Smith v. Liberty Mutual Ins. Co., supra,* says, "It is difficult, if not impossible, to discern any clear 'majority rule' from these opinions," we have seen no case claiming majority status for the view denying immunity.

As above indicated in at least two of the leading "minority" view cases the courts were divided. In the very first case, *Smith v. American Employer's Ins. Co., supra,* the court was divided three to two with a strong dissent, and in *Beasley v. MacDonald Engr. Co., supra,* the strong dissent was supported by three members of the court.

**8.** *E. g., Kotarski v. Aetna Cas. & Sur. Co.,* 244 F.Supp. 547 (E.D.Mich.1965); *West v. Atlas Chemical Industries, Inc.,* 264 F.Supp. 697, 701 (E.D.Mo.1966); *Williams v. United States Fidelity & Guaranty Co.,* 358 F.2d 799 (4th Cir. 1966); *Bartolotta v. United States, supra*; and *Horne v. Security Mutual Cas. Co.,* 265 F.Supp. 379 (E.D.Ark.1967).

**9.** *E. g., Stacy v. Aetna Cas. & Sur. Co.,* 334 F.Supp. 1216 (N.D.Miss.1971), *rev'd on other grounds* 484 F.2d 289, 291 (5th Cir. 1973); *Smith v. Liberty Mutual Ins. Co., supra*; and *Davis v. Liberty Mutual Ins. Co.,* 525 F.2d 1204, 1207 (5th Cir. 1976).

ation of the Longshoremen's and Harbor Workers' Compensation Act as amended (LHWCA or Act).

We must look to the scope and purpose of the Act along with all of its applicable provisions in order to get a full insight as to what the Congress intended. The language of an act is, of course, the fundamental guide to legislative meaning and purpose, but it is the language of the act as a whole that is to be read and considered and not the words of a particular section or provision in isolation. *Elizabeth Arden Sales Corp. v. Gus Blass Co.,* 150 F.2d 988, 993 (8th Cir. 1945), *Mustapha v. Liberty Mutual Ins. Co.,* 268 F.Supp. 890, 892 (D.R.I.1967).

Of course, the main scope and purpose of the Act, as with all workmen's compensation statutes, is to provide a system of compensation for personal injuries to employees arising out of and in the course of their employment. The compensation is to be available even without fault on the part of the employer, but in exchange for that certainty of payment, the employee gives up his right to maintain against his employer a common law negligence based action for his injuries.

■ A reading of the Act shows that while the Congress did not specifically grant immunity to a compensation insurer from liability as a third person tort feasor, numerous provisions of the Act and the spirit of the Act as a whole, equating the insurer with the employer, negate any intent to hold the insurer liable to suit for damages as a third person.[10]

The primary purpose of the Act is to provide compensation and benefits to the injured employee. In the all-important function of paying compensation and benefits, the Act completely equates the carrier with the employer. It places the carrier in the employer's shoes. Both are equally lia-

---

**10.** We rely upon the following pertinent provisions of the Act:

33 U.S.C.A. § 905(a). "The liability of an employer prescribed in section 904 of this title shall be *exclusive* and in place of all other liability of such employer to the employee . . . ." (Emphasis added.)

"§ 932(a) Every employer shall secure the payment of compensation under this chapter—(1) By *insuring* and keeping insured the payment of such compensation . . . ." (Emphasis added.)

"§ 917(a) Any person entitled to compensation under the provisions of this chapter shall have a lien against the assets of the *carrier* or employer for such compensation without limit of amount, and shall, upon insolvency, bankruptcy, or reorganization in bankruptcy proceedings of the *carrier* or employer, or both, be entitled to preference and priority in the distribution of the assets of such *carrier* or employer, or both." (Emphasis added.)

"§ 928. Fees for services—Attorney's fee; successful prosecution of claim

(a) If the employer or *carrier* declines to pay any compensation on or before the thirtieth day after receiving written notice of a claim for compensation having been filed from the deputy commissioner, on the ground that there is no liability for compensation within the provisions of this chapter, and the person seeking benefits shall thereafter have utilized the services of an attorney at law in the successful prosecution of his claim, there shall be awarded, in addition to the award of compensation, in a compensation order, a reasonable attorney's fee against the employer or *carrier* in an amount approved by

the deputy commissioner, Board, or court, as the case may be, which shall be paid directly by the employer or *carrier* to the attorney for the claimant in a lump sum after the compensation order becomes final.

(b) . . . If the claimant is successful in review proceedings before the Board or court in any such case an award may be made in favor of the claimant and against the employer or *carrier* for a reasonable attorney's fee for claimant's counsel in accord with the above provisions. In all other cases any claim for legal services shall not be assessed against the employer or *carrier.* . . .

\*    \*    \*    \*    \*    \*

(d) In cases where an attorney's fee is awarded against an employer or *carrier* there may be further assessed against such employer or *carrier* as costs, fees and mileage for necessary witnesses attending the hearing at the instance of claimant. Both the necessity for the witness and the reasonableness of the fees of expert witnesses must be approved by the hearing officer, the Board, or the court, as the case may be. The amounts awarded against an employer or *carrier* as attorney's fees, costs, fees and mileage for witnesses shall not in any respect affect or diminish the compensation payable under this chapter." (Emphasis added.)

"§ 935. Substitution of carrier for employer

In any case where the employer is not a self-insurer, in order that the liability for compensation imposed by this chapter may be most effectively discharged by the employer, and in order that the administration of this chapter in respect of such liability may be facilitated, the

ble. Notice to the employer is notice to the carrier. A judgment against the employer is, in effect, a judgment against the carrier. 33 U.S.C.A. § 935. A lien against the assets

Secretary shall by regulation provide for the discharge, by the *carrier* for such employer, of such obligations and duties of the employer in respect of such liability, imposed by this chapter upon the employer, as it considers proper in order to effectuate the provisions of this chapter. For such purposes (1) notice to or knowledge of an employer of the occurrence of the injury shall be notice to or knowledge of the *carrier*, (2) jurisdiction of the employer by a deputy commissioner, the Board, or the Secretary, or any court under this chapter shall be jurisdiction of the *carrier*, and (3) any requirement by a deputy commissioner, the Board, or the Secretary, or any court under any compensation order, finding, or decision shall be *binding* upon the *carrier* in the same manner and to the same extent as upon the employer." (Emphasis added.)

"§ 936. Insurance policies

(a) Every policy or contract of insurance issued under authority of this chapter shall contain (1) a provision to carry out the provisions of section 935 of this title, and (2) a provision that insolvency or bankruptcy of the employer and/or discharge therein shall not relieve the *carrier* from payment of compensation for disability or death sustained by an employee during the life of such policy or contract. (Emphasis added.)

"§ 941. Safety rules and regulations—Safe place of employment; installation of safety devices and safeguards

(a) Every employer shall furnish and maintain employment and places of employment which shall be reasonably safe for his employees in all employments covered by this chapter and shall install, furnish, maintain, and use such devices and safeguards with particular reference to equipment used by and working conditions established by such employers as the Secretary may determine by regulation or order to be reasonably necessary to protect the life, health, and safety of such employees, and to render safe such employment and places of employment, and to prevent injury to his employees. . . .

(b) The Secretary, in enforcing and administering the provisions of this section, is authorized in addition to such other powers and duties as are conferred upon him—

\*    \*    \*    \*    \*    \*

(4) to provide for the establishment and supervision of programs for the education and training of employers and employees in the recognition, avoidance, and prevention of unsafe working conditions in employments covered by this chapter, and to consult with and advise employers as to the best means of preventing injuries. (Emphasis added.)

"§ 933. Compensation for injuries where third persons are liable

(a) If on account of a disability or death for which compensation is payable under this chapter the person entitled to such compensation determines that *some person other than the employer* or a person or persons in his employ is liable in *damages,* he need not elect whether to receive such compensation or to recover damages against *such third person.*

(b) Acceptance of such compensation under an award in a compensation order filed by the deputy commissioner or Board shall operate as an *assignment* to the employer of all right of the person entitled to compensation to recover damages against such third person unless such person shall commence an action against such third person within six months after such award.

\*    \*    \*    \*    \*    \*

(d) Such employer on account of such assignment may either institute proceedings for the recovery of such damages or may compromise with such third person either without or after instituting such proceedings.

\*    \*    \*    \*    \*    \*

(g) If compromise with such third person is made by the person entitled to compensation or such representative of an amount less than the compensation to which such person or representative would be entitled to under this chapter, the employer shall be liable for compensation as determined in subdivision (f) of this section only if the written approval of such compromise is obtained from the employer *and its insurance carrier* by the person entitled to compensation or such representative at the time of or prior to such compromise on a form provided by the Secretary and filed in the office of the deputy commissioner having jurisdiction of such injury or death within thirty days after such compromise is made. (Emphasis added.)

(h) Where the employer is insured and the insurance carrier has assumed the payment of the compensation, the insurance carrier shall be *subrogated to all the rights* of the employer under this section.

(i) The right to compensation or benefits under this chapter shall be the exclusive remedy to an employee when he is injured, or to his eligible survivors or legal representatives if he is killed, by the negligence or wrong of any other person or persons in the same employ . . . .." (Emphasis added.)

of the employer is a lien against the assets of the carrier. 33 U.S.C.A. § 917.[11]

The Act speaks of and provides for *compensation* and *damages.* It dichotomizes the two. They differ as night differs from the day. Only two entities are liable for compensation, the employer and its carrier. The Act explicitly immunizes one, the employer, from liability for damages and, we think, impliedly so immunizes the other, the carrier. There is completely absent from the Act any indication that either entity was to be liable for both compensation and damages. The dichotomy between compensation and damages persists throughout the Act and especially in and throughout 33 U.S.C.A. § 933, which provides for the recovery of damages against "some person other than the employer or a person or persons in his employ . . . such third person." While the carrier here was not technically in the "employ" of the employer, in view of the overall purpose and provisions of the Act, it would fit that classification more nearly than the "third person" category.

To attempt to construe the Act so as to bring the compensation-paying carrier into the group of "third person[s]" ("some person[s] other than the employer or a person or persons in his employ") who may be liable for damages as distinguished from compensation, would be to ascribe to the Congress an unusual and unbecoming awkwardness of expression. Under 33 U.S.C.A. § 933(b) the employer becomes assignee of the employee's right to sue the "third person" for damages, and under 33 U.S.C.A. § 933(h) the carrier is "subrogated to all the rights of the employer." This means that the carrier can sue for damages the third person (not itself, surely). If the Congress had intended to confer upon one entity the right to sue itself, we would expect to find in the statute some explanation of so unusual a situation. This problem is not satisfactorily explained away by saying in effect that when the carrier sues itself, it, as defendant, can grant a set-off against itself as plaintiff for the amount of compensation paid, thus preventing a double recovery.[12]

A better explanation, it seems to us, is that since the Act charges the carrier with the liability of the employer (creating a lien against the assets of the carrier, 33 U.S.C.A. § 917), the carrier is likewise entitled to the immunities of the employer, and that indeed the Congress never contemplated the carrier's being held liable for damages as distinguished from compensation.

The 1972 amendments to the Act effect considerable changes in its provisions indic-

11. These statutory obligations of the carrier are incorporated in the applicable policies: "The company shall be *directly and primarily* liable to any person entitled to the benefits of the workmen's compensation law under this policy. The obligations of the company may be enforced by such person, or for his benefit by any agency authorized by law, whether against the company alone or jointly with the insured. Bankruptcy or insolvency of the insured or of the insured's estate, or any default of the insured, shall not relieve the company of any of its obligations under Coverage A.

"As between the employee and the company, notice or knowledge of the injury on the part of the insured shall be notice or knowledge, as the case may be, on the part of the company; the jurisdiction of the insured, for the purposes of the workmen's compensation law, shall be jurisdiction of the company and the company shall in all things be bound by and subject to the findings, judgments, awards, decrees, orders or decisions rendered against the insured in the form and manner provided by such law and within the terms, limitations and provi-

sions of this policy not inconsistent with such law.

"All of the provisions of the workmen's compensation law shall be and remain a part of this policy as fully and completely as if written herein, so far as they apply to compensation and other benefits provided by this policy and to special taxes, payments into security or other special funds, and assessments required of or levied against compensation insurance carriers under such law.

\* \* \* \* \* \*

"Nothing herein shall relieve the insured of the obligations imposed upon the insured by the other terms of this policy." (Emphasis added.)

12. "The fact that the carrier would be subrogated to a claim against itself did not trouble the court [*Smith v. American Employer's Ins. Co.,* 102 N.H. 530, 163 A.2d 564 (1960)]; the amount of compensation could simply be set off, thus preventing a double recovery." Larson, *Workmen's Compensation Insurer as Suable Third Party,* 1969 Duke L.J., 1117, 1121.

ative of Congress' original and continuing intent with respect to the overall purpose and operation of the Act and with respect, we think, to our particular question. Prior to the amendment, an injured employee covered by the Act could file suit against a vessel for breach of the warranty of seaworthiness (*Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1966)) and the vessel in turn under the Ryan Doctrine (*Ryan Stevedoring Co. v. Pan-Atlantic SS Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956)) would seek indemnity from the stevedore (employer) and its insurance carrier, who would ultimately pay any adverse judgment and ultimately have the employer reimburse it in premiums. Congress recognized the inequities in the so-called "Longshoreman-vessel-stevedore" actions in that "the social costs of these lawsuits, the delays, crowding of court calendars and the need to pay for lawyers' services have seldom resulted in a real increase in actual benefits for injured workers." 92nd Congress 2d Session, Senate Report No. 92–1125, Calendar No. 1067. In said Senate Report, it is stated:

> For a number of years representatives of the employees have attempted to have the benefit levels under the Act raised so that injured workers would be properly protected by the Act. At the same time, employer groups indicated their willingness to increase such payments but indicated they could do so only if the Longshoremen's and Harbor Workers' Compensation Act were to again become the exclusive remedy against the stevedore as had been intended since its passage in 1927 until modified by various Supreme Court decisions. The bill reported by the committee meets these objections by specifically eliminating suits against vessels brought for injuries to longshoremen under the doctrine of seaworthiness and outlawing indemnification actions and "hold harmless" or indemnity agreements. It continues to allow suits against vessels or other third parties for

negligence. At the same time it raises benefits to a level commensurate with present day salaries and with the needs of injured workers whose sole support will be payments under the Act.

Our holding upholds the intent of Congress in amending the Act. To hold otherwise would be to permit the injured employee an election between the higher "benefit levels" of compensation under the Act and the prosecution of a third person action against his employer's insurance carrier. In the event of a damage suit recovery in excess of the higher "benefit levels" of compensation, it would again be the employer who pays the price through premium increases. Helpful here is the case *Nations v. Morris,* 331 F.Supp. 771 (D.La.1971) and this court's affirmance in 483 F.2d 577 (1973). There an employee entitled to compensation and benefits under the Act sued a fellow employee (as was permissible under the Louisiana Compensation Act), and the fellow employee's insurance carrier.[13] The district court held that since the LHWCA, 33 U.S.C.A. § 933, granted immunity to the defendant coworker, it also granted immunity to the coworker's insurance carrier. Judge Heebe for the district court wrote at p. 775:

> In resolving the question whether the immunity of a coworker from common-law suit should be extended to the insurer, the theory of the compensation legislation should be considered. The entire purpose was to (1) ensure that the injured worker would receive speedy and sure monetary compensation without resort to finding liability based on fault and (2) limit the employer's liability only to compensation and make him immune from common-law suits. The employer discharges this liability by obtaining insurance.

> ＊   ＊   ＊   ＊   ＊   ＊

It becomes obvious that in considering the LHWCA, the employer's limitation of liability, one half of the legislative bar-

---

**13.** A distinction between the *Nations* case and ours is that in *Nations* the plaintiff sought to hold the insurer, not on the ground of the negligence, but under Louisiana's direct action statute.

gain, would be an empty phrase if the employer would be required to maintain insurance for his "managing employees" to provide unlimited recovery in common-law damage suits brought by other employees. The employer's liability is limited by the statute to compensation payments. The employer operating under the LHWCA has no duty either by statute, common law or good business reasons to provide and maintain liability insurance for the tortious acts committed by one of its employees against another employee, even though this same employer, operating under the Louisiana Compensation Act, would obtain insurance.

To hold otherwise would be to strain the intent and purpose of this federal statute. The Court holds the immunity of the coworker from a common-law suit instituted by another coworker to be a substantive, nonpersonal defense which goes to the nature of the obligation. This immunity defense is one that can be pleaded by the insurer.

On appeal this court affirmed, pointing out at page 581 that the Act

[P]rovides a compensation scheme for determining who shall pay, how much money,[9] after which occurrences, for what

> [9] L & H (the Act) provides for generous benefits. Unlike many state compensation acts L & H provides permanent benefits for permanent total disability. 33 U.S.C.A. § 908. The Act provides for payment of medical expenses—as opposed to disability payments—for a period limited only by the duration of the disability. § 907. These have become even more generous with the 1972 amendments, 86 Stat. 1253 et seq., 33 U.S.C.A. § 908 as amended.

duration, to which persons, and provides the machinery for enforcing these determinations,

and concluding at page 589:

[The Act] is complete and self-sufficient. It affords specific rights by imposing specific responsibilities. In return for sometimes awesome obligations it extends to the employer and fellow employees an absolute civil immunity. Under a scheme of permissible underwriting of the employer's sweeping obligations—as directed by [the Act] § 935—there is an effec-

tuation of the congressional scheme. There is no need to impose outside state oriented obligations on the insurer—especially in a sophisticated world, that has to be aware that in the long run it is the employer who pays the fare.

More than that, in this structure, to allow these claims would inevitably reflect on the employers claims loss record, [and] thus, to permit enforcement of the Direct Action Statute would be inconsistent with federal law.

The *quid pro quo* expected from the employer in return for the grant of immunity from tort liability is, in the case of the self-insurer, the payment of compensation, and in the case of the insured employer, the payment of insurance premiums adequate to cover compensation liability—not the payment of insurance premiums adequate to cover unlimited tort liability, either of the employer or of the compensation insurer.

Of similar import is *Cella v. Partenreederei MS Ravenna*, 529 F.2d 15 (1st Cir. 1975). There an attorney claimed that in pursuing an injured longshoreman's third party complaint to settlement he created a "common fund" which was shared by the longshoreman and his employer's compensation carrier and demanded that the carrier be required to pay reasonable attorney's fees out of that portion of the recovery received by it. In refusing that demand, the court, through Chief Judge Coffin said at p. 20:

> We conclude that the overriding purpose of the 1972 amendments was to strictly limit the liability of the stevedore [employer] in order to husband its resources, and its *insurance carrier's* resources, for payment of the increased benefits under the Act. (Emphasis added.)

Some of the decisions of other courts construing somewhat similar state compensation statutes have been helpful. In *Donohue v. Maryland Cas. Co.*, 248 F.Supp. 588, 592 (D.Md.1965), aff'd 363 F.2d 442 (4th Cir. 1966), it is held that when an insurer is performing the duty of an insured employer

it obtains the employer's immunity from suit for tort liability and that it matters not whether the employer's duty is imposed by statute or by common law. There the duty was to provide a safe place to work, to make inspections and to take reasonable safety measures. There the plaintiff's fatal injuries originally resulted from a remediable hazard which should have been but was not discovered during the insurer's safety inspection. In our case the employer's duty was imposed by the Act (33 U.S.C.A. § 941) as well as by common law.

In *Flood v. Merchants Mutual Ins. Co.,* 230 Md. 373, 187 A.2d 320, 323 (1963), the court decided that the insurer was not a third party as contemplated by the statutory language, "some person other than the employer."

*Also* in *Hughes v. Maryland Cas. Co.,* 229 Mo.App. 472, 476, 76 S.W.2d 1101, 1104 (1934), it is held that "a negligent third person, within the meaning of the act, is one upon whom no liability could be entailed under the act."

Two opinions we find particularly persuasive because of their discussion of policy considerations, *Kotarski v. Aetna Cas. & Sur. Co.,* 244 F.Supp. 547 (E.D.Mich.1965), aff'd, 372 F.2d 95 (6th Cir. 1967), and *Gerace v. Liberty Mutual Ins. Co.,* 264 F.Supp. 95 (D.D.C.1966). In *Kotarski* the court, in granting summary judgment for the defendant carrier, said on p. 558, 559:

> To hold that the defendant who, in performance of a function, necessitated by its role as workmen's compensation insurer, may be sued under the third-party liability provision, could have a decidedly detrimental effect upon the entire compensation program as set up by the legislature. To be sure, as was said in *Fabricius v. Montgomery Elevator Co.,* [254 Iowa 1319, 121 N.W.2d 361] supra, it is doubtful that all insurers will leave the field. However, although the statute does not require insurers to inspect the buildings and equipment of employers, they must do so for their own protection. It would be economically foolish, as well as a waste of manpower resources, to

allow accidents which could be easily prevented to occur. Certainly the insurance carrier presents an inviting target when the plaintiff is interested in circumventing the limited recoveries permitted and the immunities granted by the compensation act. . . . Insurance companies which engage in accident prevention work, the social desirability of which cannot be questioned, should be able to do so without incurring unlimited liability for failing to discover a hazard that some jury might [7] think ought to have been

[7] Michigan law takes cognizance of the prejudice against insurance companies. In *Holman v. Cole,* 242 Mich. 402, at page 404, 218 N.W. 795, at page 796, (1928) the court stated, that "It is a fact of which we cannot but take judicial notice that, in cases where jurors obtain information that the damages as fixed by them will be paid by insurance companies, the amount thereof is usually greatly enhanced." The Michigan Insurance Code of 1956, in section 3030, C.L. of '48 § 500.3030 (Supp.1956), Mich.Stat.Ann. § 24.13030, provides that in actions brought by an injured person, the casualty insurer may not be made or joined as a party defendant, and that no reference whatever may be made to such insurer or to the question of carrying such insurance during the course of trial. The public policy sought to be sustained in this state by the statute and judicial decisions is that a plaintiff shall not be permitted to inject into his suit the element of insurance and thereby obtain an unjust and excessive verdict. *Lieberthal v. Glens Falls Indemnity Co.,* 316 Mich. 37, 24 N.W.2d 547 (1948). The policy and validity of the statute was reaffirmed in *Darr v. Buckley,* 355 Mich. 392, 94 N.W.2d 837 (1959) in which the court held that no reference to insurance could be made during the voir dire jury examination.

discovered. If any insurance company can escape tort liability altogether by not making any inspections on the premises of the insured, but may incur unlimited tort liability by making some inspections, it more than likely will decline to make any, unless required to do so by statute. The ultimate losers will be workmen and their families. The Workmen's Compensation Act is certainly concerned with better and safer working conditions, as well as adequate compensation for injuries. An insurance carrier which conducts a safety inspection program works to achieve these statutory aims, as well as

to protect itself. If insurers are to be held liable in tort, as well as for workmen's compensation, every time such an inspection fails to reveal a preventable accident, it would be in effect strict liability. Such additional liability should be imposed only by the legislature and not by the court. The Workmen's Compensation Act was passed to provide for strict liability of the employer, financed by insurance. Liability of the insurer as a negligent third party, when performing an act necessary to the proper carrying out of its function under the act, does not fit into the legislative program.

In *Gerace,* Judge Holtzoff decided that the compensation insurance carrier of a general contractor which reserves under its policy the right to inspect the insured's premises does not incur third party liability to employee of subcontractor injured on the insured's premises by its undertaking of such inspection. The court, after recognizing that "a Good Samaritan who carelessly injures the person he is trying to help may perhaps be liable for his negligence," said

In this case, however, the insurance carrier did not undertake to perform a voluntary act for the benefit of someone else. It did so for its own protection in order to reduce risks that might give rise to liability on the policy. Not only is there no basis in reason for the creation of a liability sought to be established here, there is a consideration of public policy to be weighed. Employees and the public generally are helped to some extent by inspections such as the insurance carrier in this case and other similar cases try to make. If a liability for accidents was created in case the insurance company's inspectors fail to discover a defective condition, the result might well follow that insurance companies will refrain from inspection and refrain from even reserving the right to inspect because the risk of inspecting would be too great. The only persons who will suffer would be employees and possibly third parties, as well as the public generally.

\*      \*      \*      \*      \*      \*

In view of these considerations the Court is of the opinion that no cause of action exists against an insurance company as a result of the permissive clause giving it authority to inspect the premises of the insured, irrespective of whether the insurance company does or does not take advantage of the provision.

Accordingly, the defendant's motion for summary judgment is granted.

It would be futile to attempt to reconcile or distinguish all cases which have reached a different conclusion. Some may be distinguished on the basis of statutory language. For instance, the New Hampshire statute construed in *Smith v. American Employer's Ins. Co., supra,* nowhere mentioned "insurance", only requiring that employers not financially able to bear damages themselves must post sufficient bond (see *Mustapha v. Liberty Mutual Ins. Co.,* 268 F.Supp. 890, 895 (D.R.I.1967)).

*Gallichio v. Corporate Group Service, Inc.,* 227 So.2d 519 (Fla.Dist.Ct.App.1969) is distinguishable on the ground that the defendant there was under a "contractual duty". The employer was a self-insurer and had contracted with the defendant under a contract which "imposed upon the appellee the duty to make safety inspections of the employer's premises". The complaint did not allege that the defendant "occup[ied] the position of an insurer".

Some cases are certainly irreconcilable. For instance, in *Beasley v. MacDonald Engineering Co.,* 287 Ala. 189, 249 So.2d 844 (1971), as the able dissent concurred in by three judges cogently points out, the majority denied immunity despite the fact that the Alabama statute said, "The term 'employer' . . . shall, if the employer is insured, include his insurer as far as applicable . . .", a fact which Professor Larson had accepted as "virtually dispos[ing] of the issue by express language".

As pointed out in *Smith v. Liberty Mutual Ins. Co.,* 409 F.Supp. 1211, 1218 (M.D.N.C. 1976), in a number of states, court decisions denying immunity have lead to legislative action amending the relevant portions of the Workmen's Compensation Acts so as to exempt insurance carriers from liability as

third persons.[14] Such legislative action means either that the legislators never did intend that the carriers be liable or that they are now convinced that they should not be held liable.

[4] While to some extent, whether or not the insurer is immune will depend on the facts in each case and while it is possible to imagine situations where the insurer could be held liable as a third person,[15] this is not such a case. On the contrary, under the facts of this case, the compensation insurance carrier is clearly entitled to partake of the employer's immunity. WE AFFIRM.

**14.** Such amendments were accomplished in New Hampshire and Pennsylvania (see *Bartolotta v. United States, supra,* p. 73); also in Alabama (according to appellee's brief) and in Illinois and Michigan (see *Smith v. Liberty Mutual Ins. Co., supra,* n. 4, 7).

**15.** See *Bartolotta v. Liberty Mutual Ins. Co.,* 411 F.2d 115, 117 (2d Cir. 1969).