Billie J. ATKINSON,
Plaintiff–Appellant,

v.

GATES, McDONALD & COMPANY,
Defendant–Appellee.

No. 87–4621
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

March 4, 1988.
Rehearing and Rehearing En Banc
Denied March 31, 1988.

Joe Clay Hamilton, David H. Linder, Meridian, Miss., for plaintiff-appellant.

Robert J. Kent, McCutchan, Schmidt & Druen, Columbus, Ohio, T. Kenneth Watts, Eppes, Watts & Shannon, Meridian, Miss., for defendant-appellee.

Before GEE, GARWOOD, and JONES, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiff–Appellant Billie J. Atkinson (Atkinson) brought this diversity action seeking damages from defendant-appellee Gates, McDonald & Company (Gates, McDonald) for its alleged bad faith in terminating compensation benefits due Atkinson under the Longshoremen and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901 *et seq.*, on account of an injury she sustained on May 20, 1980 in the course of her employment with the Navy Resale Services Support Office (NAVRESSO). The latter is a nonappropriated fund

---

activity which is an instrumentality of the United States. Its liability for compensation for work-related injury of its employees is governed by the Nonappropriated Fund Instrumentalities Act, 5 U.S.C. § 8171 *et seq.*, which extends the coverage of the LHWCA to employees of nonappropriated fund instrumentalities. *Id.* at §§ 8171(a) & (b). NAVRESSO was a self-insurer for compensation purposes and maintained a fund to pay compensation benefits to its employees. Gates, McDonald contracted with NAVRESSO to administer that fund, including processing, investigating, and settling workers' compensation claims of NAVRESSO employees, and paying compensation benefits to such employees on NAVRESSO's behalf from the NAVRESSO fund.

Gates, McDonald paid Atkinson LHWCA disability compensation benefits, and most but not all of her medical expenses, from the date of her injury through May 31, 1984, when it terminated all payments, allegedly without notification to Atkinson. After numerous but unsuccessful attempts to determine the reason for the discontinuance of benefits, Atkinson in March 1985 filed an employee's claim for compensation with the United States Department of Labor, as provided for under the LHWCA, and shortly thereafter Gates, McDonald was notified of the claim. Gates, McDonald at no time notified the Department of Labor of the suspension of compensation payments, nor did it ever file a controversion of Atkinson's entitlement to compensation, as required under the LHWCA. 33 U.S.C. §§ 914(a), (c), & (d). Ultimately, in January 1986, the Department of Labor ordered that Atkinson's disability benefits be reinstated and instructed NAVRESSO to bring her benefits up to date and to pay Atkinson a ten percent penalty thereon together with her attorneys' fees, as provided in the LHWCA. 33 U.S.C. §§ 914 (e) & 928. Gates, McDonald, with NAVRESSO funds, thereupon paid Atkinson all her back benefits, the ten percent penalty, and her attorneys' fees, and it reinstated and continued to timely pay her compensation benefits.

After her LHWCA compensation benefits were thus resumed, and Atkinson was paid the past due benefits, penalty, and attorneys' fees, she brought the present diversity action against Gates, McDonald. In her final amended complaint, Atkinson alleged that Gates, McDonald, "arbitrarily, callously, intentionally, capriciously, wrongfully, unreasonably, in bad faith, without any reasonably legitimate or reasonably arguable reason," did not make any disability or medical payments to Atkinson from March 31, 1984 to January 22, 1986, as well as failing prior to March 31, 1984 to pay certain medical expenses, "although the Plaintiff was clearly entitled to" all such payments. Atkinson also alleged that Gates, McDonald in so acting "willfully, intentionally, wrongfully and in bad faith used the fact of unequal wealth and bargaining position of the parties to effect economic gain for itself" and "intentionally caused the Plaintiff to suffer anxiety, worry, mental and emotional distress and other incidental damages." Atkinson sought one million dollars in compensatory damages and five million dollars in punitive damages. Following discovery, Gates, McDonald filed a motion to dismiss under Fed.R.Civ.P. 12(b)(6) and for summary judgment, which the district court granted, dismissing Atkinson's claims with prejudice.

Atkinson brings this appeal, and we affirm, being essentially in agreement with the district court's well-reasoned opinion. *Atkinson v. Gates, McDonald & Co.*, 665 F.Supp. 516 (S.D.Miss.1987).

■ As the district court correctly noted, Atkinson "is asserting what are in essence state law claims for bad faith intentional infliction of emotional distress" in terminating and refusing to pay compensation benefits and medical expenses which Atkinson was entitled to under the LHWCA. *Id.* at 519–20. The district court held, and we agree, "that the exclusivity provisions of both the Nonappropriated Fund Instrumentalities Act[1] and the LHWCA,[2] coupled

1. *See* 5 U.S.C. § 8173: "The liability ... of a    nonappropriated fund instrumentality ... with

with the penalty provision of section 914(e) of the LHWCA,[3] operate to bar Atkinson's claims." *Id.* at 519 (footnotes supplied). In essence, then, Atkinson's state law claims are preempted by the Unappropriated Fund Instrumentalities Act and the LHWCA, which provide the exclusive remedy for the nonpayment of compensation benefits due thereunder.

Other sections of the LHWCA, in addition to sections 5 and 14(e), reinforce this conclusion. Section 14(a) provides that compensation "shall be paid ... promptly ... without an award, *except* where liability to pay compensation is controverted by the employer." (Emphasis added.) Section 14(b) requires compensation to be paid on the fourteenth day after the employer has notice of the injury, and thereafter semi-monthly. Section 14(c) requires the employer to give notice to the deputy commissioner when making the first payment of compensation "and upon suspension of payment for any cause," while section 14(g) requires notice to the deputy commissioner within sixteen days after the final payment of compensation is made and provides for a one hundred dollar civil penalty against the employer if such notice is not timely given. Section 14(d) requires the employer, if it "controverts the right to compensation," to file with the deputy commissioner, within fourteen days after knowledge of the alleged injury, a notice of controversion. As noted, section 14(e) calls for a ten percent penalty when pre-award benefits are not timely paid, *unless* notice of controversion has been filed (*see* note 3, *supra*). Subsection (f) provides for a twenty percent penalty on any compensation payable under the

terms of an award that is not paid within ten days after it becomes due, unless the award has been appealed and a stay order entered. 33 U.S.C. § 914. Further, section 28 of the LHWCA provides for an award of attorneys' fees and certain expenses to the successful claimant where entitlement to compensation has been disputed. 33 U.S.C. § 928.[4]

Thus, the scheme of the LHWCA is that the employer is absolutely required to pay compensation promptly on notice of injury and in the absence of a timely written controversion. Failure to do so incurs the ten percent penalty of section 14(e), unless the employer shows that "owing to conditions over which he had no control such installment could not be paid" timely. Similarly, however, the Act gives the employer the absolute, unfettered right to timely controvert the entitlement to compensation, in which event no compensation is owing, under the express terms of section 14(a), and no penalty is owing, under the express terms of section 14(e), unless and until an award is made by the deputy commissioner. In that event, compensation is due within ten days of the award, and failure to timely pay the award, unless it is stayed pursuant to an appeal, results in the twenty percent penalty of section 14(f). We have held that this penalty "does not admit to an exception for late payment for equitable reasons." *Lauzon v. Strachan Shipping Co.,* 782 F.2d 1217, 1222 (5th Cir.1985). Moreover, where a plaintiff secures payment of compensation by an award, attorneys' fees and certain expenses may also be adjudged in his favor. 33 U.S.C. § 928.

respect to the disability or death ... of an employee ... shall be determined as provided by this subchapter. This liability is exclusive and instead of all other liability of the United States or the instrumentality to the employee ... because of the disability or death...."

2. *See* 33 U.S.C. § 905(a): "The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee ... on account of such injury or death...."

3. *See* 33 U.S.C. § 914(e): "If any installment of compensation payable without an award is not

paid within fourteen days after it becomes due, ... there shall be added to such unpaid installment an amount equal to 10 per centum thereof, ... unless notice [of controversion] is filed under subdivision (d) of this section, or unless ... [the employer shows] that owing to conditions over which he had no control such installment could not be paid within the period prescribed...."

4. The LHWCA also subjects an employer to criminal penalties for failing to secure payment of compensation and for knowingly secreting assets with intent to avoid payment of compensation. 33 U.S.C. § 938.

In 1984, Congress enacted further amendments to the LHWCA, including a new provision making it a criminal offense for an employer, its agent, or an employee of an insurance carrier, to knowingly and willfully make a false statement or misrepresentation for the purpose of reducing, denying, or terminating compensation benefits. 33 U.S.C. § 931(c). The legislation which became the 1984 amendments to the LHWCA was the product of several years of congressional consideration. During this period of time, organized labor took the position that employers all too often arbitrarily refused to pay compensation resulting in "cases of members virtually having been forced to accept settlements far below their proper entitlements" under the LHWCA, as "the injured worker in need of immediate care and income protection is in a far more vulnerable position than his employer or longshore insurance carrier." *See generally,* Longshoremen's and Harbor Workers' Compensation Act Amendments of 1981: Hearings on S. 1182 Before the Subcommittee on Labor of the Senate Committee on Labor and Human Resources, 97th Cong., 1st Sess. 433, 516–23, 545 (1981). Congress, however, did not enact any legislation to modify the employer's absolute, unfettered right under the LHWCA to controvert compensation claims, nor did it change the penalty structure of section 14 of the LWHCA; rather, it confined its actions in respect to these concerns to enacting the new above-referenced section 31(c) and increasing the penalties provided in section 38 (*see* note 4, *supra* ). 33 U.S.C. §§ 931(c) & 938.

In arguing that the LHWCA does not preempt her claims, Atkinson advances essentially two contentions. First, she asserts that the exclusivity provision of section 5(a) (*see* note 2, *supra* ) applies only to liability "on account of such injury," and that under section 2(2) "injury" is defined as "accidental injury ... arising out of and in the course of employment." 33 U.S.C. § 902(2). Atkinson points to the fact that she has not worked for NAVRESSO since her May 20, 1980 injury, and that accordingly the damages which she claims for the subsequent failure to pay compensation benefits cannot possibly arise out of her employment. She also points to the fact that the exclusivity provision of section 5(a) is directed only to the liability of the "employer," and the defendant here is not her employer, NAVRESSO, but is rather Gates, McDonald.

We reject these contentions. The former contention overlooks the fact that Atkinson's claim necessarily presupposes an obligation to pay LHWCA benefits, and hence necessarily arises out of her on-the-job injury. *See Sanders v. United States,* 387 F.2d 142 (5th Cir.1967) (Federal Employees' Compensation Act prohibits separate suit for negligence of government doctors in treatment of covered injuries). More importantly, it also overlooks other specific provisions of the LHWCA, particularly sections 14 and 28, and its overall structure, as discussed in more detail below. As to the latter contention, we have held that the LHWCA impliedly grants the employer's insurance carrier, and the insurance carrier of co-employees, the same immunity which it grants the employer and co-employees. *See Johnson v. American Mutual Liability Ins. Co.,* 559 F.2d 382 (5th Cir.1977); *Nations v. Morris,* 331 F.Supp. 771 (E.D. La.1971), *affirmed,* 483 F.2d 577 (5th Cir. 1973). We reached this result in *Johnson* "in view of the overall purpose and provisions of the Act," which led us to conclude that the insurance carrier more appropriately fitted in the category of the employer as opposed to that of a "third person" who may be sued under section 33, 33 U.S.C. § 933. *Johnson,* 559 F.2d at 390. It obviously makes no sense for the employer's agent not to have the immunity which the employer would if carrying out the same actions directly. Our holdings in *Johnson* and *Nations* were likewise premised on the recognition that the ultimate cost would in any event be borne by the employer. *See Johnson,* 559 F.2d at 392; *Nations,* 483 F.2d at 589 ("in the long run it is the employer who pays the fare"). This is no less true where the liability is sought to be imposed on the self-insured employer's claims agent.

Atkinson's contentions also disregard other relevant provisions of the LHWCA, particularly sections 14 and 28. Under the scheme established in section 14, the employer has the unfettered right to controvert a claim for compensation and, if the employer does so, no compensation is due until an award is made. There can be no *wrongful* failure to pay compensation when no compensation is due. If, as in this case, there has been no timely controversion, then the penalty for pre-award failure to pay compensation is that fixed by section 14(e), and no other penalty is provided for, except that if an award is entered attorneys' fees may also be ordered under section 28. As the district court aptly observed:

"Since the Act itself provides not only for payment of benefits, but also for redress in the event of nonpayment of benefits, and further does not distinguish between good faith and bad faith nonpayment of benefits, the apparent intent of the Act is that the penalty provisions provide the exclusive remedy for late payment or nonpayment of benefits." *Atkinson*, 665 F.Supp. at 521 (footnote omitted).

In these circumstances, the LHWCA is plainly preemptive of any state law claim for intentional or bad faith wrongful refusal to pay benefits due under the Act, and this is true even in the absence of any expressly preemptive language. As the Supreme Court stated in *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982), "Absent explicit preemptive language, Congress' intent to supersede state law altogether may be inferred because '[t]he scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it' ... or because 'the object sought to be obtained by federal law and the character of obligations imposed by it may reveal the same purpose.' " Moreover, "[e]ven where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law. Such a conflict arises ... when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Id.* In order to find such an actual conflict for this latter purpose, it is not necessary that compliance with both state and federal law be impossible. *Id.* at 3022–23.

Here, the pervasiveness of the LHWCA treatment of the payment of compensation due, and the conflict therewith which necessarily flows from any state penalty scheme respecting failure to pay LHWCA benefits which differs from the scheme of the LHWCA itself, persuade us that Atkinson's state law claims are preempted. Surely when the LHWCA provides that there shall be a ten percent penalty on all required pre-award payments not made when due, except where circumstances beyond the employer's control precluded payment, it likewise inferentially, but nonetheless plainly, also provides that the penalty shall not be *any* different amount, and that liability for it shall not vary according to anything, such as good or bad faith, other than the inability of the employer to make the required payment due to circumstances wholly beyond its control. Such a construction of the LHWCA is but another application of the principle that " '[w]hen a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.' " *National R. R. Passenger Corp. v. National Ass'n of R. R. Passengers*, 414 U.S. 453, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974). Similarly, when Congress made provision in the Death on the High Seas Act for recovery of pecuniary loss, it impliedly proscribed recovery, under either general maritime law or state law, for loss of society. *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978); *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 106 S.Ct. 2485, 2499, 91 L.Ed.2d 174 (1986). As the Court said in *Higginbotham*, "Congress did not limit DOHSA beneficiaries to recovery of their pecuniary losses in order to encourage the creation of nonpecuniary supplements." 98 S.Ct. at 2015. The Court in *Tallentire* reiterated this lan-

guage in holding that state law claims for loss of society are preempted by DOHSA. 106 S.Ct. at 2499. Such reasoning is especially appropriate in this workers' compensation context, for "compensation laws are practically always thought of as substitutes for, not supplements to, common-law tort actions." *United States v. Demko*, 385 U.S. 149, 87 S.Ct. 382, 383–84, 17 L.Ed. 2d 258 (1966) (holding compensation statute for federal prisoners preempted otherwise available remedy under the Federal Tort Claims Act, despite the absence of any express exclusivity language in the compensation statute). *See also Brown v. General Services Administration*, 425 U.S. 820, 96 S.Ct. 1961, 1969, 48 L.Ed.2d 402 (1976) ("We have consistently held that a narrowly tailored employee compensation scheme pre-empts the more general tort recovery statutes.").

While we have not previously determined the precise issue presented in this case,[5] we have held that a state law cause of action for conduct which the LHWCA addresses is in effect preempted by the LHWCA even though the relevant LHWCA section contains no expressly preemptive language. *See LeSassier v. Chevron USA, Inc.*, 776 F.2d 506 (5th Cir.1985) (holding that Louisiana statutory action for retaliatory discharge is "inconsistent" with section 48a of the LHWCA, 33 U.S.C. § 948a, within the meaning of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(a)(2)(A)). Moreover, the Ninth Circuit and the District of Columbia Circuit have held that claims for bad faith refusal or delay in paying LHWCA benefits are preempted by the LHWCA. *Sample v. Johnson*, 771 F.2d 1335, 1345–47 (9th Cir.1985), *cert. denied*, 475 U.S. 1019, 106 S.Ct. 1206, 89 L.Ed.2d 319 (1986); *Hall v. C & P Telephone Co.*, 809 F.2d 924, 926 (D.C.Cir. 1987).[6] As the *Hall* Court stated, "We could recognize such a cause of action, however, only by undoing the 'legislated compromise between the interests of employees and the concerns of employers.'" 809 F.2d at 926. We also agree with the observation in *Sample* that a majority of courts have held that workers' compensation statutes, particularly where they address the subject of delayed or withheld compensation benefits, provide the exclusive remedy in that respect. 771 F.2d at 1347. 2A Larson, *Workmen's Compensation Law* § 68.34(c) (1987), notes that "the great majority" of the decisions reject, for one reason or another, "attempted tort actions based on intentional delay in or termination of [workers' compensation] payments." *Id.* at 13–127. The author goes on to state:

5. That issue was determined adversely to Atkinson by the panel opinion in *Texas Employers' Ins. Ass'n v. Jackson*, 820 F.2d 1406, 1411–15 (5th Cir.1987), but this Court granted rehearing en banc in *Jackson, id.* at 1426, thus vacating the panel opinion. We observe that *Jackson* involved other potentially dispositive issues. *Id.* at 1422 *et seq.* (dissenting opinion of Judge Jones).

6. We recognize that an apparently contrary result was reached by the First Circuit in *Martin v. Travelers Ins. Co.*, 497 F.2d 329 (1st Cir.1974). However, to the extent that the result or rationale of *Martin* is inconsistent herewith, we elect to follow *Sample* and *Hall*.

*Martin* involved a situation where the defendant insurance company stopped payment on LHWCA compensation drafts, which had previously been given to the plaintiff worker and "had been deposited and substantially drawn upon by plaintiff" and on the faith of which plaintiff "had written checks which had become worthless." *Id.* at 330. The First Circuit held that the district court erred in dismissing the complaint for failure to state a claim, and re-

manded the case for further consideration, observing, "It remains less than clear whether and to what extent plaintiff claims that his damages were caused by delay in effective compensation payment as distinguished from the stop payments themselves." *Id.* at 331. Accordingly, it is perhaps possible to construe *Martin* as involving a situation where the conduct complained of, issuing and delivering drafts and then stopping payment on them after they had been deposited and checks drawn against them, would be actionable even if the compensation benefits for which the drafts were given were not actually owing to begin with. In other words, it might be possible to construe *Martin* as presenting a situation where the plaintiff's recovery would not depend on a determination that he was owed compensation under the LHWCA or that the defendant violated the LHWCA. If this be a correct reading of *Martin*, then that decision may not be inconsistent with our present holding, and we need not here address how we would dispose of such a claim. On the other hand, if this is not a correct reading of *Martin*, then we expressly decline to follow that decision.

"It seems clear that a compensation claimant cannot transform a simple delay in payments into an actionable tort by merely invoking the magic words 'fraudulent, deceitful and intentional' or 'intentional infliction of emotional distress' or 'outrageous' conduct in his complaint. The temptation to shatter the exclusiveness principle by reaching for the tort weapon whenever there is a delay in payments or a termination of treatment is all too obvious, and awareness of this possibility has undoubtedly been one reason for the reluctance of courts to recognize this tort except in cases of egregious cruelty or venality.

"One final factor may be noted that has figured in many of these cases: the presence in the statute of an administrative penalty for the very conduct on which the tort suit is based. A majority of the courts have taken the view that this evidences a legislative intent that the remedy for delay in payments, even vexatious delay, shall remain within the system in the form of some kind of penalty. Several courts, however, have rejected this reasoning, without very convincing rationales. A federal district court, for example, in *Carpentino [v. Transport Ins. Co.*, 609 F.Supp. 556 (D.C.Conn.1985)]*, argued that penalties might not fully compensate the plaintiff. Since when, we may ask, has it been necessary for compensation acts to compensate claimants fully? Other courts have correctly pointed out that, although the penalties may in some instances be inadequate, this does not, within the overall nature of the compensation concept, make them invalid. At most, it may be cause to apply to the legislature for a more suitable penalty level." *Id.* at 13–145–146 (footnotes omitted).

Some of the more recent state cases following the same approach are *Zurich Ins. Co. v. Mitchell*, 712 S.W.2d 340 (Ky.1986) (following "[t]he great majority of courts," *id.* at 343); *Robertson v. Travelers Ins. Co.*, 95 Ill.2d 441, 69 Ill.Dec. 954, 448 N.E.2d 866 (Ill.1983) (following "[a] majority of the jurisdictions," *id.* 69 Ill.Dec. at 957, 448 N.E.2d at 869); and *Dickson v. Mountain States Mutual Casualty Co.*, 98 N.M. 479, 650 P.2d 1 (1982).

Atkinson contends that the exclusivity rationale is defective because it inevitably leads to the conclusion that there could be no common-law tort claim against an insurance company if, for example, its employee, in the course of investigating the plaintiff's claim for LHWCA compensation benefits, were to illegally enter plaintiff's residence to get needed evidence. Atkinson cites her own passage from *Larson, supra,* in support of this argument.[7] But the obvious difference between the examples posed by Atkinson and *Larson* (*see* note 7, *supra*) in this connection, and the case of bad faith refusal to pay compensation benefits, is that in the former class of case plaintiff's entitlement to recover in the tort action is in no way dependent on his having been entitled to compensation benefits or to the defendant's having violated the compensation statute. By contrast, in order to recover for bad faith or malicious failure to pay compensation benefits there must have been an entitlement to such benefits or a violation of the compensation statute in the failure to pay them. This is an important distinction for at least two reasons. In the first place, where entitlement to the compensation benefits would be a necessary element of plaintiff's right to recover in a tort suit, to allow the separate tort action opens the possibility of inconsistent results between the resolution of the compensation

---

7. "But must we go on to say that the carrier acquires complete tort immunity ever after for anything its agents do to carry out their investigation? Suppose the agent had decided to burglarize the claimant's house to get needed evidence. Suppose claimant died of fright on seeing the burglar. Is the compensation act the exclusive remedy, merely because the activity involved, which was the collecting of evidence, was in the mainstream of the agent's duties?

"Again, suppose a claimant has a compensable broken toe, and is being tailed by a photographer. Claimant sees him in the bushes, a scuffle ensues, and claimant receives a skull fracture as a result of a blow from the camera. Is this skull fracture nothing but an aggravation of the broken toe?" *Larson, supra,* § 68.34(b) at 13–123–124.

claim itself and the resolution of the separate tort claim, as the two claims would be adjudicated by different bodies. This consideration is clearly applicable in the LHWCA context where the compensation rulings are made in a federal administrative framework, with provision for appeal to an administrative review board and then to a regional federal court of appeals, while the tort action would likely be determined by a jury in a state or federal trial court. In the second place, the LHWCA, in common with many other compensation statutes, expressly addresses the matter of when payments thereunder are to be made and provides penalties for failing to timely make the required payments. By contrast, neither the LHWCA nor the typical compensation statute addresses in any analogous manner the methods which the employer or insurance carrier may or may not utilize in investigating the claim. We reject Atkinson's parade of horribles argument.

Accordingly, we hold that the district court correctly determined that Atkinson's claims are preempted by the LHWCA and the Nonappropriated Fund Instrumentalities Act, and its dismissal of Atkinson's suit is therefore

AFFIRMED.