Bender Shipbuilding Repair Company, Inc., appealed to the Court of Civil Appeals from a judgment entered on a jury verdict in favor of Faron Walley. The Court of Civil Appeals affirmed the judgment. Bender Shipbuilding Repair Co. v. Walley,879 So.2d 568 (Ala.Civ.App. 2002). We granted certiorari review; we reverse and remand.
The Court of Civil Appeals stated the facts as follows:
 "In 1990, [Faron] Walley injured his upper back while he was working at Bender's shipyard as a shipfitter for a company known as T.J. Adams, a subcontractor of Bender. For the next two years, Walley was unable to work because of his injury. During this time, T.J. Adams, through its workers' compensation insurance carrier, Liberty Mutual, *Page 579 
paid for Walley's medical treatment and also paid Walley temporary disability compensation pursuant to the LHWCA [Longshoremen and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq.]. Dr. James West, Walley's treating physician, eventually assigned him a 5% permanent impairment rating and released him for full-duty work with no restrictions in 1992. After his release, Walley worked for the next three years as a shipfitter, welder, and fabricator for two companies other than T.J. Adams and Bender. Walley was able to perform the same type of work he had performed before his 1990 back injury. During the three-year period between 1992 and 1995, Walley had no further injury to his back.
 "In 1995, Walley was again employed by a subcontractor to work at Bender's shipyard. After approximately three months, however, Bender hired Walley to work directly for Bender. At that time, Walley was examined by Bender's physician and was determined to be physically and mentally fit for work as a shipfitter.
 "In November 1996, Walley complained to his foreman at Bender that he was experiencing work-related soreness in his upper back and shoulder. Walley was examined by Dr. West and was prescribed some pain medication; he immediately returned to work. He worked for the next few weeks without incident.
 "On December 9, 1996, Walley injured his back while lifting a mooring hook on a ship at Bender's shipyard. Walley informed his foreman of the injury and finished his shift despite the injury. The next morning, Walley's back pain had worsened and he contacted his foreman, who told him to contact Vicki Wagner, an employee in Bender's safety department. When Wagner asked Walley whether his injury was related to his 1990 upper-back injury, Walley stated that it might be, but that his entire back was hurting. Conflicting evidence was introduced at trial as to whether Walley's December 1996 injury was a recurrence of his 1990 injury, as opposed to an aggravation of his 1990 injury or a new injury. More importantly for purposes of Walley's intentional-fraud claim, there was conflicting evidence as to whether Bender understood and believed Walley's December 1996 injury to be a recurrence of his 1990 injury, rather than an aggravation of that injury or a new injury.
 "Wagner made Walley an appointment with Dr. West, who examined Walley on December 10, 1996, and informed him that he should not return to work at that time. Dr. West examined Walley on four other occasions during the next month and, after each examination, he told Walley that he should not return to work at that time. Although a December 18, 1996, entry by Dr. West on Walley's medical chart contains a statement that `[t]he patient states that this is related to his old injury and not [a] new injury,' Dr. West's subsequent January 22, 1997, notes reflect his opinion that `this is an exacerbation of [Walley's] previous injury.'
 "On January 22, 1997, Dr. West again examined Walley and released him to return to work with a light-duty restriction. Walley returned to Bender's shipyard and provided Wagner with his light-duty work release. However, Walley testified that Wagner and Jerry Davis, a safety and risk manager for Bender, discussed the release and told him that Bender had no light-duty work available.
 "We note that Bender was self-insured under the LHWCA and that its light-duty work policy for partially disabled *Page 580 
employees was in addition to its obligations with respect to compensation and medical benefits under the LHWCA. Under the light-duty work policy, Bender paid an injured employee the full amount of his or her normal weekly wage when the employee engaged in light-duty work. Employees receiving only temporary disability benefits under the LHWCA received payments equal to only a portion of their normal weekly wage. See 33 U.S.C. § 908. Davis testified that one of the reasons Bender established its light-duty work policy was that it knew that employees could become fearful, anxious, and depressed when they could not return to work after an on-the-job injury and that the policy benefited both Bender and its injured employees.
 "Although T.J. Adams, through Liberty Mutual, initially paid for Walley's medical expenses resulting from his December 1996 injury, T.J. Adams refused to pay Walley's temporary disability benefits and eventually stopped paying his medical expenses. In March 1997, Walley retained an attorney and filed a complaint against Bender with the United States Department of Labor. Pursuant to its rights under the LHWCA, Bender initially contested Walley's claim. However, after a June 1997 meeting between the Department of Labor, Bender, and Walley, Bender accepted the Department of Labor's finding that Bender was responsible for Walley's medical expenses and compensation benefits under the LHWCA. Bender began paying Walley's medical expenses and, within a few weeks, also began paying Walley temporary disability benefits. Bender thereupon also offered Walley light-duty work in accordance with its light-duty work policy.
 "Walley had no income between the date of his December 1996 back injury and June 1997, when Bender accepted responsibility for paying LHWCA benefits to Walley. Dr. West released Walley to return to full-duty work effective September 1, 1997.
 "Although Bender paid Walley's medical expenses and also his LHWCA compensation benefits accruing after the June 1997 meeting with the Department of Labor, it was not until July 1998 that Bender paid Walley the temporary disability benefits due for the period from his December 1996 injury until the June 1997 meeting. Bender subsequently paid penalties assessed by the Department of Labor against Bender for its failure to make timely compensation payments in accordance with the LHWCA. See 33 U.S.C. § 914(e).
 "Walley was unable to pay his living expenses for several months after Dr. West released him for light-duty work in January 1997. As noted, during the period, Bender did not pay Walley compensation benefits under the LHWCA and did not provide him with light-duty work. As a result, Walley borrowed money from family and friends to pay his living expenses. He also received assistance from community resources, and he eventually applied for and received food stamps. Walley averted creditors' efforts to repossess his truck and to foreclose on his home by borrowing money from his family, including a $20,000 loan from his parents. Because he had no source of income, Walley was unable to pay a court-ordered monthly child-support obligation for the benefit of his son. Walley stated that his former wife attempted to have him held in contempt for his failure to pay child support and that she refused to let him exercise his visitation rights with their son until he had paid all of his child-support obligation. As noted above, in *Page 581 
July 1998, Bender paid Walley all of the remaining temporary disability compensation to which he was entitled. After receiving that payment, Walley paid his past-due child-support obligation; he had been unable to visit with his son for approximately 18 months. There was evidence introduced at trial indicating that Walley was so affected by his circumstances that, in May 1997, a neighbor had Walley hospitalized because he had not been eating and she was concerned about his being depressed.
 "In October 1997, Walley sued Bender in the Mobile Circuit Court alleging, in pertinent part, that Walley was entitled to an offer of light-duty work after he was released for such work in January 1997, but that Bender falsely represented to Walley that no light-duty work was available. Walley alleged that as a result of Bender's alleged fraud, he suffered monetary losses and mental anguish; he requested both compensatory damages and punitive damages.
 "As previously indicated, by July 1998, Bender had paid Walley all of the temporary disability compensation to which Walley was entitled pursuant to the LHWCA. Thereafter, Bender filed a motion for a summary judgment arguing, among other things, that Walley's fraud claim was barred by the exclusivity provision of the LHWCA, 33 U.S.C. § 905(a), and also that, although some courts have recognized an intentionaltort exception to the LHWCA's exclusivity provision if the employer has specifically intended to injure the employee, Walley had failed to allege and offer evidence that Bender specifically intended to injure him. The trial court denied Bender's motion.
 "Walley's case proceeded to trial. At the close of Walley's evidence and again at the close of all of the evidence, Bender filed motions for a judgment as a matter of law, renewing its argument that Walley's fraud claim was barred by the exclusivity provision of the LHWCA and that Walley did not qualify for the intentional-tort exception to the LHWCA's exclusivity provision. The trial court denied both of those motions and submitted Walley's claim to the jury only as a claim alleging intentional fraud. As noted above, the jury returned a verdict in favor of Walley and against Bender for $40,000 in compensatory damages, and the court entered a judgment on that verdict. Bender filed a postjudgment motion for a judgment as a matter of law pursuant to Rule 50, Ala. R. Civ. P.; the trial court denied that motion."
879 So.2d at 570-73 (footnotes omitted).
The Court of Civil Appeals rejected Bender's argument that Walley's claims were preempted by the Longshoremen and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq. ("the LHWCA"). That court concluded that the cases cited by Bender were distinguishable because they involved benefits the LHWCA requires an employer to pay. Continuing, the Court of Civil Appeals stated:
 "The LHWCA did not require Bender to provide light-duty work to Walley as part of his `compensation,' and it did not provide Walley with any redress for Bender's alleged fraud in denying him light-duty work. See generally 33 U.S.C. § 901 et seq. The mere fact that Walley could not claim Bender's light-duty-work benefit unless Bender was also responsible for paying his LHWCA compensation did not convert the light-duty-work benefit into `compensation' due under the LHWCA. Thus, Bender's argument that Walley's claim is simply a claim for the mishandling or denial *Page 582 
of benefits due under the LHWCA is without merit. . . .
". . . .
 "Unlike [the cases] relied upon by Bender, the state-law claim submitted to the jury in the present case was not a claim for an alleged improper handling or denial of benefits due under the LHWCA. As noted, Bender eventually paid all compensation and medical benefits due Walley under the Act, as well as all related penalties due under the Act, and Walley dismissed his claims pertaining to Bender's initial denial of those benefits.
 "Walley's claim that was submitted to the jury was based upon an alleged intentional misrepresentation that there was no light-duty work available during the period of Walley's temporary disability. Any obligation to provide Walley with such light-duty work in the first place, and therefore any duty to avoid misrepresenting the availability of such work, arose outside of the LHWCA. It arose because Bender undertook to provide such work and the full compensation benefits associated therewith as an additional benefit to its employees. Providing such work was not a benefit required by the LHWCA."
879 So.2d at 576-77.
The Court of Civil Appeals' reasoning is based upon a faulty premise, i.e., that Bender's program that provided light-duty work to injured employees provided a benefit outside of the LHWCA. The court is correct that the LHWCA does not require an employer to provide light-duty work. The United States Court of Appeals for the Fifth Circuit has defined an employer's obligation to an injured employee under the LHWCA as follows:
 "The LHWCA distinguishes disabilities binarily with respect to both their duration (permanent or temporary) and their degree (partial or total). See 33 U.S.C. § 908. . . . The duration of disability is a medical question, so an injured employee is considered temporarily disabled under the LHWCA until he attains maximum medical improvement (`MMI'). . . . However, because the degree of an employee's disability is primarily an economic rather than a medical concept, `the availability of suitable alternative employment [is what] distinguishes partial from total disability.' . . . Thus, an employee is entitled to receive temporary total disability benefits, in the form of two thirds of his average weekly wages, so long as his medical condition is believed capable of improvement and he is unable to obtain suitable alternative employment. See 33 U.S.C. § 908(b)."
Pool Co. v. Cooper, 274 F.3d 173, 175 n. 2 (5th Cir. 2001) (citing Louisiana Ins. Guar. Ass'n v. Abbott, 40 F.3d 122, 126 (5th Cir. 1994)) (emphasis added). Under the LHWCA, once an employee establishes a prima facie case of total disability, the burden then shifts to the employer to establish the availability of other jobs the employee is capable of performing. Abbott,40 F.3d at 126. See also New Orleans Stevedores v. Turner,661 F.2d 1031, 1032 (5th Cir. 1981). The availability of "suitable alternative employment" is what distinguishes partial disability from total disability. Abbott, 40 F.3d at 126.
An employer can meet its burden of establishing the availability of "suitable alternative employment" by offering the claimant a light-duty job in its facility. Dardin v. NewportNews Shipbuilding Dry Dock Co., 18 BRBS 224, 226 (1986)[1] *Page 583 
("It is beyond question that an employer can meet its burden of establishing suitable alternate employment by supplying light duty work to claimant."). Therefore, an employer charged pursuant to the LHWCA with compensating an injured employee may provide light-duty work for an injured employee in certain circumstances and thereby avoid the obligation to pay that employee temporary total disability benefits that might otherwise apply. If the employer is not able to establish that suitable alternate employment is available, either in its own facility or elsewhere, then the LHWCA obligates the employer to pay disability benefits to the employee. See Manigault v. Stevens Shipping Co., 22 BRBS 332 (1989).
Bender had such a light-duty program. Jerry Davis, Bender's safety and risk manager at the time of Walley's disability, testified as follows:
 "[T]he thought and the theory behind light duty really arrived out of the medical profession. Doctors realized that when a person gets injured and he is away from his employment, that oftentimes they develop somewhat depression, they get anxiety, they get a fear that they won't be able to do their jobs, and won't be able to go back, and the people that they work with won't respect them, and things like that. So doctors realized that getting the person back to work as soon as he can after an injury was real good for a person's recovery. And they seem to heal better. They got back into the labor force, they got with their friends and guys that they knew, and things like that. And that whole scenario enabled an injured person to heal and progress more rapidly than sitting home watching the soapbox [sic], or something like that.
 "So that's the theory of getting people back to work. Also it helped in the industry that when somebody was able to do some kind of meaningful employment, it was good for the employee to get back, not only from the company's standpoint, also from the employee's standpoint, and also from the doctor's standpoint.
 "So I set up a light-duty program at Bender to get those employees that had some type of temporary injury back to work as soon as possible."
Davis further testified that Bender's light-duty-work program was available only to employees who were making claims against Bender for compensation benefits and for whom Bender was directly responsible for paying LHWCA benefits.
In view of the foregoing, and recognizing that "the degree of an employee's disability is primarily an economic rather than a medical concept," Pool Co., 274 F.3d at 175 n. 2, we conclude that the availability of a light-duty-work program, while not mandated by the LHWCA, is an economic benefit an employer can offer its employees in lieu of its obligation to pay temporary total disability benefits. Although the LHWCA does not require that such a benefit be provided, claims regarding the mishandling of an economic benefit such as light-duty work, made available to an employee as the employer's alternative means of complying with the LHWCA, would arise under the LHWCA.
Walley's complaint alleges:
 "On or about January 24, 1997, Defendant, BENDER SHIPBUILDING, by and through its agent and employee, Vick[i] Wagner, represented that Defendant, BENDER SHIPBUILDING, had no light duty positions available for Plaintiff, FARRON WALLEY [sic]. In *Page 584 
reliance upon this representation, Plaintiff, [Walley], did not return to work at BENDER SHIPBUILDING following Dr. West's release to return to work on a light duty basis in January 1997.
". . . .
 ". . . [A]s a result of the abovesaid misrepresentation by Defendant, BENDER SHIPBUILDING, [Walley] has been damaged in that Plaintiff would have returned to work on a light duty basis following Dr. West's release in late January 1997, earning his full wages. . . . Plaintiff, [Walley], has received no wages from Defendant, BENDER SHIPBUILDING, since his December 9, 1996 accident, nor has he received temporary total disability benefits for any period of time that he has not returned to work following this injury."
Walley sought compensatory and punitive damages against Bender for "fraud, deceit, misrepresentation and mental anguish." The trial court submitted Walley's claim to the jury as an "intentional fraud claim," and the Court of Civil Appeals also refers to the claim in that manner. Despite being labeled an "intentional fraud claim," however, Walley's claim is actually a claim alleging that Bender, intentionally or in bad faith, refused to award a benefit to him and, in so doing, intentionally inflicted emotional distress. We treat a pleading and any other filing according to its substance, rather than its form or its style. Breaux v. Bailey, 789 So.2d 204 (Ala. 2000). Therefore, the issue in this case is whether Walley's claim against Bender for its intentional refusal to pay benefits in the form of alternative employment at full pay is preempted by the LHWCA.
Most federal courts that have examined the question whether an employee's state-law claims alleging intentional or bad-faith refusal to pay LHWCA compensation, wrongful termination of LHWCA benefits, or the intentional infliction of emotional distress as a result of failure to pay or the termination of LHWCA benefits have concluded that such claims are preempted by the LHWCA. See, e.g., Barnard v. Zapata Haynie Corp., 975 F.2d 919, 920 (1st Cir. 1992) (holding that the plaintiff's claim for the employer's intentional infliction of emotional distress in failing to pay benefits was preempted by the LHWCA and that the LHWCA is the "exclusive remedy for [an employer's] failure to make timely [compensation] payments, irrespective of [the employer's] reasons for nonpayment"); Atkinson v. Gates, McDonald Co.,838 F.2d 808, 812 (5th Cir. 1988) (holding that a state-law cause of action addressed by the LHWCA is preempted and that "the LHWCA is plainly preemptive of any state law claim for intentional or bad faith wrongful refusal to pay benefits due under the [LHWCA]");Texas Employers' Ins. Ass'n v. Jackson, 820 F.2d 1406 (5th Cir. 1987), rev'd on other grounds, 862 F.2d 491 (5th Cir. 1988) (en banc); Hall v. C P Tel. Co., 809 F.2d 924 (D.C. Cir. 1987) (claims alleging intentional infliction of emotional distress in bad-faith refusal to make timely compensation payments fall within the exclusivity provisions of the LHWCA); Sample v.Johnson, 771 F.2d 1335 (9th Cir. 1985) (claims for wrongful refusal to pay or delay in paying LHWCA benefits are preempted by the LHWCA).
In Jackson, a panel of the United States Court of Appeals for the Fifth Circuit concluded that the employee's bad-faith claims brought under Texas law were preempted by the LHWCA. Jackson had sued his employer's LHWCA insurance carrier in state court, alleging bad-faith insurance practices on the part of the carrier. The Jackson court explained that federal law preempts state law in three *Page 585 
circumstances: first, when Congress explicitly expresses its intent to preempt state law; second, when Congress's intent to displace state law can be inferred through the comprehensiveness or pervasiveness of the federal regulatory scheme; and third, when state law conflicts with federal law or interferes with the accomplishment and execution of Congress's purpose.820 F.2d at 1411. The panel then concluded that the LHWCA preempted the state law invoked by Jackson in all three circumstances. Id. That portion of the panel's decision was affirmed by the Fifth Circuit sitting en banc, although the en banc court reversed the decision on other grounds. See 862 F.2d at 496 n. 7.
In Atkinson, the Fifth Circuit noted that "a majority of courts have held that workers' compensation statutes, particularly where they address the subject of delayed or withheld compensation benefits, provide the exclusive remedy in that respect." 838 F.2d at 813. The Fifth Circuit then quoted the following from 2A Larson, Workmen's Compensation Law § 68.34(c), 13-145 to -146 (1987):
 "`It seems clear that a compensation claimant cannot transform a simple delay in payments into an actionable tort by merely invoking the magic words "fraudulent, deceitful and intentional" or "intentional infliction of emotional distress" or "outrageous" conduct in his complaint. The temptation to shatter the exclusiveness principle by reaching for the tort weapon whenever there is a delay in payments or a termination of treatment is all too obvious, and awareness of this possibility has undoubtedly been one reason for the reluctance of courts to recognize this tort except in cases of egregious cruelty or venality.
 "`One final factor may be noted that has figured in many of these cases: the presence in the statute of an administrative penalty for the very conduct on which the tort suit is based. A majority of the courts have taken the view that this evidences a legislative intent that the remedy for delay in payments, even vexatious delay, shall remain within the system in the form of some kind of penalty.'"
838 F.2d at 814.
The foregoing observation in Atkinson points out another reason most courts hold that claims alleging an employer's intentional refusal to pay benefits are preempted by the LHWCA. The LHWCA imposes upon employers a penalty for withholding benefits for any reason; it does not distinguish between good-faith or bad-faith withholding of benefits. 838 F.2d at 812. As the Court of Civil Appeals noted, Bender paid the statutory penalty to Walley imposed by the Department of Labor upon its determination that Bender owed compensation benefits to Walley.
Walley relies upon Martin v. Travelers Insurance Co.,497 F.2d 329 (1st Cir. 1974), to support his argument that his claims against Bender for refusing to make light-duty work available to him can properly be brought in state court. In Martin, the United States Court of Appeals for the First Circuit held that the LHWCA may not preclude a claimant from pursuing a state-law action where the basis of the state-law claims does not arise out of or in the course of the claimant's employment. The unsuccessful employee in Jackson also relied upon Martin. The Fifth Circuit in Jackson declined to follow Martin, basing that decision not only upon its own conclusions about the preemptive effect of the LHWCA, but also upon the United States Supreme Court's reasoning in Allis-Chalmers Corp. v. Lueck,471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985). In Lueck, an employee sued his employer and the employer's insurer in state court, alleging *Page 586 
bad-faith failure to pay disability benefits. The Supreme Court of Wisconsin held that the employee could proceed with his action in state court. The United States Supreme Court reversed the judgment of the Wisconsin Supreme Court, holding that § 301 of the Labor Management Relations Act preempted the state tort claim and emphasizing the importance of national uniformity in enforcing the terms of collective-bargaining agreements. TheJackson court noted that although the Supreme Court in Lueck
"purported not to decide whether a state bad faith failure to pay a tort claim would be preempted by `other federal laws governing employment or benefit plans,' the reasoning in Lueck is just as compelling, if not more so, when applied to the situation in the instant case." 820 F.2d at 1413-14 (quoting Lueck,471 U.S. at 220, 105 S.Ct. 1904). Furthermore, in Barnard v. Zapata HaynieCorp., supra, the First Circuit pointed out that in Martin the insurance carrier had stopped payment on drafts it had issued to the employee. Distinguishing Martin, the First Circuit stated:
 "[T]he facts in the present case relate solely to a refusal to pay benefits, and do not involve a stop payment or dishonor of a draft issued to a claimant against which the claimant in good faith issued checks of his own. . . . [W]e find the LHWCA to be Barnard's exclusive remedy for defendants' failure to make timely payments, irrespective of defendants' reasons for nonpayment."
975 F.2d at 920.
In light of the weight of the authority holding that an employee's state-law claims alleging the intentional refusal or failure to pay benefits against an employer covered by the LHWCA are preempted by the LHWCA, we conclude that Walley's claim against Bender for failure to confer a benefit offered only as a means of the employer's satisfying its obligations under the LHWCA is likewise precluded. We reverse the judgment of the Court of Civil Appeals and remand the case for that court to direct the trial court to enter a judgment in favor of Bender.
REVERSED AND REMANDED.
HOUSTON, SEE, BROWN, HARWOOD, WOODALL, and STUART, JJ., concur.
JOHNSTONE, J., recuses himself.
[1] The cite to 18 BRBS 224 refers to a case decided by the Benefits Review Board of the United States Department of Labor, the administrative appellate tribunal established by the LHWCA with jurisdiction over LHWCA claims.